McBRIDE, Judge.
This appeal presents an action arising out of a tragic traffic accident which happened on the morning of October 9, 1952, about 7:45 o’clock on U. S. Highway 61, on the north side of Bayou Manchac approximately twelve miles south of Baton Rouge. One of the vehicles involved was a Ford automobile owned by Julius C. Stock-well and driven by him in a southerly direction or toward New Orleans, and the other was a heavily-ladened stake body GMC truck, owned by Gulf Engineering Company, Inc., and which was being operated by its employee, Frazie Hall, in a northerly direction or toward Baton Rouge. The left portion of the front ends of the two vehicles came into collision at a point 40 or 50 yards north of the bridge which spans the bayou. The force of the collision was terrific and photographs in the record show that the whole of the left side of the Ford was sheared off and the car was demolished.
Julius C. Stockwell, with the members of his family, had spent the previous night at a tourist motel in Baton Rouge. On the fatal morning Stockwell proceeded to drive to New Orleans. Riding with him on the front seat was his wife, Mrs. Gloria Gomez Stockwell, and between them sat their child Elmer, aged three years. The left side of the rear seat was occupied by their five-year-old child Linda, while Leslie, aged ten (Stockwell’s child from another union), sat on the right side of the rear seat. Stockwell and his children Elmer and Leslie were killed in the accident. Mrs. Stockwell and the child Linda, although seriously injured, managed to survive.
Mrs. Gloria Gomez Stockwell as natural tutrix for, her minor child, Linda M. Stock-well, brought this suit (which was consolidated for the purposes of trial with another suit) on behalf of the minor for $63,500 for damages for personal injuries and disfigurement, etc., sustained by the minor. She impleaded as defendants Gulf Engineering Company, Inc., its liability insurer, New Amsterdam Casualty Company, and The Travelers Indemnity Company, which is the liability insurer of the Stockwell automobile, and prayed for a judgment in solido against them.
Various charges of negligence are charged against Frazie Hall, who operated the Gulf Engineering Company’s truck. Stockwell is also alleged to have been negligent. Among other things, Hall is charged with speeding, a failure to reduce his speed after seeing Stockwell’s car approaching, a failure to maintain a lookout, and a failure to keep sufficiently to the right side of the road so as to avoid the accident. The negligence ascribed to Stockwell is that he veered across the center line and encroached upon the northbound lane.
In its answer, The Travelers Indemnity Company denied that Stockwell was anywise negligent, and alleged that the sole and proximate cause of the accident was the gross and wanton negligence of Frazie Hall, the employee of Gulf Engineering Company, Inc., in several enumerated particulars, which need not be set out here.
The Gulf Engineering Company, Inc., and New Amsterdam Casualty Company, in making answer to the suit, disavowed any negligence on the part of Frazie Hall and set forth that Julius C. Stockwell’s negligence in several detailed particulars was the cause of the accident.
On.these issues the case proceeded to ‘trial which culminated in a judgment being rendered in favor of the plaintiff, as natural tutrix for Linda M. Stockwell, for $25,000 against The Travelers Indemnity Company alone. Suit as to the other two defendants was dismissed.
The Travelers Indemnity Company has appealed not only from that judgment but also from the refusal of the trial judge on October 20, 1954, to permit The Travelers Indemnity Company to bring into this suit as third-party defendants, pursuant to LSA- *388 R.S. 13:3381, the Gulf Engineering Company, Inc., and its insurer, New Amsterdam Casualty Company. Mrs. Stockwell also took an appeal but only insofar as the judgment dismissed her demands against Gulf Engineering Company, Inc., and its insurer.
It would be well at this point to dispose of certain preliminary pleas made by The Travelers Indemnity Company and which the trial judge overruled. The first of these, the exception of no cause or right of action, has evidently been abandoned by said appellant as no reference was made by its counsel to the exception either in oral argument or in brief.
The other plea made by The Travelers Indemnity Company is that LSA-R.S. 22:655, as amended, (providing that an injured person or his heirs shall have a right of direct action against a liability insurer within the terms and limits of the policy), LSA-R.S. 22:983, as amended, (providing that the Secretary of State shall issue no certificate of authority to do business in Louisiana to a foreign or alien liability insurer until such insurer shall consent to being sued by the injured person or his or her heirs in a direct action) and LSA-C.C. art. 2098 (relating to codebtors in solido) as interpreted by the Supreme Court of Louisiana in the case of Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191, are unconstitutional as being violative of Art. I, Sec. 10, and the Fourteenth Amendment of the U. S. Constitution, and Art. I, Sec. 2 of the Constitution of the State of Louisiana, LSA-Const.
We have not been favored with argument of counsel as to the validity of pleas of unconstitutionality, but we notice in brief that counsel anticipated that the pleas would be overruled. They say:
“May we say, in conclusion, therefore, that the Pleas of Unconstitutionality filed by us were so filed, not with any hope of their being sustained by the Trial Court or by this Court, but such Pleas have been made in good faith and for the purpose of reserving to the defendant its rights to bring such Pleas before the Supreme Court of the United States for determination.”
However, we might say in passing that the constitutionality of the direct action statute has been tested and approved by the U. S. Supreme Court. The latest opinions are Lumbermen’s Mutual Casualty Co. v. Elbert, 348 U.S. 48, 75 S.Ct. 151, decided December 6, 1954, and Watson v. Employers Liability Assurance Corporation, 348 U.S. 66, 75 S.Ct. 166, also decided the same day.
The trial judge was correct in overruling the plea.
Highway 61 has a paved roadway with two lanes for traffic divided by a center stripe; a short distance north of the Bayou Manchac Bridge the highway takes a curve toward the left.
Three witnesses were called to testify with reference to the events preceding and up to the time of the accident. The first of these, Mrs. Gloria Stockwell, stated that because of her normal preoccupation with the three children she did not see the oncoming truck until a moment before the collision when her attention was directed to its presence as a result of her husband’s last remark “Oh my God,” and then the collision occurred. She knew nothing of the location of the two vehicles with respect to the median line of the roadway.
Mr. F. Evans Farwell was called as a witness for the defense, and the gist of his testimony is that on the morning of the accident he was driving on Highway No. 61 from New Orleans to Baton Rouge and had observed the Gulf Engineering Company’s truck several times. For a period of about two or three minutes he found it necessary to stop his automobile near the Ascension Parish line and then resumed his journey at a speed of approximately 45 miles per hour and was just about to overtake the truck when it reached the Bayou Manchac Bridge. He could see the stake body of the truck after it had crossed the bridge from his position on the south side of the bridge.
*389 It would appear to us to be impossible for Mr. Farwell, from his position on the south side of the bridge, to have seen the lower portion of the truck or the highway beyond the north end of the bridge, for the reason that the elevation of the apex of the camber-shaped bridge would interfere with his view of both the roadway and the vehicles on the other side. Mr. Farwell mentioned that he could see some machinery on the truck, and this would seem to bear out our thought that he was unable to see more than the top portion of the truck’s body. He stated he saw what appeared to him to be an explosion on the other side of the bridge in his lane of traffic, and upon reaching the crest of the bridge he observed that there had been an accident. We attach no importance to the witness’ statement that the explosion occurred in the northbound traffic lane, for the reason, as we have already said, that it would have been impossible for Mr. Farwell to have seen the roadway, and in addition to this a.s the highway north of the bridge curves considerably to the left his testimony as to exactly where the crash took place becomes all the more unreliable.
Frazie Hall, the employee of Gulf Engineering Company, Inc., who drove the truck, testified that he has had twelve years’ experience as a truck operator. On the morning of the accident he was proceeding from New Orleans to Baton Rouge with a truckload of heavy equipment weighing approximately five tons. He insists that he had been traveling along the highway at 45 miles an hour, but that upon reaching the bridge he reduced his speed to 35 or 40 miles an hour. From a position on the bridge he could see the Stockwell car about 150 or 200 yards away and it was on its proper side of the highway. He stated that the Stockwell car “was swinging” or “swang” partly over to his lane, but his thought at the time was that its driver would return to his proper lane. When it became evident to him that the Ford was going to continue traveling partly in the northbound roadway, Hall says he swerved the truck toward the right to a position where its right wheels were located upon the shoulder of the road and then applied his brakes. Notwithstanding his maneuver, the left front portions of the vehicles came together with the result that for its entire length the left side of the Ford automobile was sheared off and the car was demolished. After the impact, Hall’s truck continued down the highway in the direction in which it had been traveling for a distance of 210 feet past the point of impact and then left the \road on its left-hand side.
There is no testimonial evidence in the record tending to show that at any time before the accident happened or at the time of its happening Frazie Hall was operating the truck at an unlawful or excessive rate of speed. He testified that Stockwell’s Ford automobile at the moment of the impact was traveling at 60 miles per hour. He estimated his own speed to have been 45 miles per hour, but that upon reaching the bridge he reduced his speed to 35 to 40 miles per hour to facilitate a crossing and that he was still traveling at this lesser speed when the crash occurred. Hall’s statement as to the truck’s speed is borné out in great measure by Mr. Farwell’s testimony that he had been driving his own automobile at 45 miles an hour and was about to overtake the truck when it reached and crossed the bridge. Hall stated that when he saw the Ford coming he swerved his right wheels over onto the shoulder of the road to get out of Stockwell’s way, explaining that he could not have driven farther to the right for the reason that the shoulder is elevated at the point and there was a steep slope to his right. Hall said he applied his brakes “but not too hard” fearing that his heavy load might make a sudden stop extremely dangerous.
Counsel for The Travelers Indemnity Company argue that the fact that the truck traveled 210 feet beyond the point of the collision eloquently demonstrates that the truck was being driven at a rate of speed much in excess of that testified to by its driver. We are unwilling to accept the physical fact that the truck traveled the 210 feet after colliding with the Ford automobile as convincing evidence that the *390 track’s speed was any more than that stated by Hall, whose testimony in that regard seems fully corroborated by Mr. Farwell’s assertions that he was driving his car at 45 miles an hour and was in the act of overtaking the truck just as it reached the Bayou Manchac Bridge.
Plaintiff’s counsel and also counsel for The Travelers Indemnity Company contend that because Frazie Hall could see the Stockwell automobile swaying over onto the left side of the road from some distance away that Hall was highly negligent in not immediately bringing his vehicle to a stop or taking some other steps to avoid colliding with the oncoming Ford.
We have carefully read and analyzed Frazie Hall’s testimony, and we do not find that anywhere therein he stated that Stock-well’s car was swaying back and forth from one side of the road to the other. What the witness did say was that the Ford was “swinging” or “swang” onto the left-hand lane, and it appears quite clear from the context of all of Hall’s testimony that the Stockwell car approached somewhat on Hall’s side of the road and that he believed that its driver would pull over to his proper side of the roadway before reaching the truck.
There is well-settled jurisprudence in Louisiana to the effect that a motorist traveling on the right side of the road has the right to assume that the driver of a vehicle approaching from the opposite direction on the wrong side of the road will return to the proper side in sufficient time to meet and pass in safety.
In Waguespack v. Savarese, La.App., 13 So.2d 726, 730, this court had occasion to say:
“If Mr. Waguespack’s story is correct, when he was somewhere between 150 and 300 feet from the other car he saw it swerve to his side and back at least twice. It is obvious that this must have taken a few seconds. And, since he was driving at a moderate speed, it is possible that he might have brought his car to a stop when he saw the other car cut to his side of the road. And yet we think it quite possible that, as he says, he did not realize that the other car would stay on the wrong side or would come back to the wrong side and he assumed, as he was justified in doing, that it would return to its correct position and would remain there. He assumed what Mr. Blash-field in his work entitled Cyclopedia of Automobile Law and Practice says he had a right to assume:
“ ‘A motorist has a right to assume that the driver of a vehicle coming from the opposite direction will obey the law, and to act upon such assumption in determining his own manner of using the road. A driver, therefore, proceeding on the right side of the traveled way, may assume that the driver of a vehicle approaching on the same side, or on his left hand side, will do all that a reasonably prudent person, under all the circumstances, would do to avoid a collision, which ordinarily would be to yield half the way or to turn out in time to avoid a collision, and that such driver will not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road on which he is lawfully driving.
“ ‘Likewise, a motorist on the right side of the road and traveling in a lawful manner can assume that one approaching in the opposite direction will control his car in obedience to the law of the road and will not suddenly turn across his path.’ Vol. 2, Perm. Ed., § 919, page 60.
“As a matter of fact, however, the Rummel car came back to the wrong side, and, on its last trip, was obviously so close to Waguespack when he realized that it had done so, that he could not bring his car to a stop and could pull it no further to its right.”
Our brothers of the Second Circuit in Lacy v. Lucky, 19 La.App. 743, 140 So. 857, 860, in a similar case said this:
*391 “True enough, plaintiff’s driver saw for some distance that Lucky was traveling upon the wrong side of the road, but he rightly assumed that Lucky would return to the proper side in ample time to meet and pass in safety. So it was not negligence on the part of plaintiff’s driver to go on in his travel. This he did until the two cars were about to meet, and, suddenly realizing that defendant Lucky was apparently making no effort to get his car back to his proper side, and that a head-on collision was imminent if he did not do something to avoid it, he concluded that the best way of escape was to swerve his car to the left, so, as he did, Lucky at the same time swerved his car to his right, striking plaintiff’s car to the rear of the right front fender, at what appears to have been an angle of about forty-five degrees, resulting in damages to both cars and in injuring both plaintiff and defendant. The driver of plaintiff’s car escaped injury.”
There are many other authorities stating the rule enunciated in the cases quoted from, viz.: Lee v. Kastner, La.App., 69 So.2d 137; Cutrer v. Jones, La.App., 9 So.2d 859; Leforte v. Gorum, La.App., 7 So.2d 733; Bazile v. J. F. Landry & Co., Inc., 10 La.App. 747, 122 So. 901; Kennedy v. Opdenweyer, 11 La.App. 532, 121 So. 636; Goodson v. Schuster’s Wholesale Produce Co., 10 La.App. 486, 120 So. 689; Manget Bros. v. Henry, 13 La.App. 57, 127 So. 51.
Counsel for The Travelers Indemnity Company cite the case of Williams v. Brown, La.App., 181 So. 679, 680, as being authority for the principle that if the motorist in Flail’s position has no reasonable grounds upon which to assume that the other driver will timely resume travel on his side of the road, it would devolve upon him to exercise all due diligence and precautions and to take such action as will avoid an emergency and avert an accident. We have carefully read the cited case and believe that its facts render it entirely dissimilar to the instant case. In the cited case the driver who was on the right sidq of the road should have known when the other vehicle was 100 yards away that an accident was inevitable; yet he took no-precautions and drove his truck rapidly forward for the 100 yards until an emergency was created.
We are not aware of any circumstances which were sufficient to bring home to Frazie Hall that Stockwell did not intend to, or was unable to, return to his right side of the roadway. His failure to come to a complete stop is unimportant, for we are convinced that the Ford would have been driven into the truck even if the truck had been brought to a stop. Viewing all of the circumstances, it seems to us that Hall acted with prudence in driving his truck as far to the right as possible and we do not believe that the accident can be attributed to either primary or contributory negligence on his part.
In our opinion the sole cause of the accident was the negligence of Julius C. Stockwell, the insured of The Travelers Indemnity Company, in driving his automobile in a southerly direction partly in the lane of traffic reserved for northbound traffic. What may have caused Stockwell to drive in such manner is not shown by the record but the conclusion that he was negligent is inescapable. His insurer must respond in damages for the injuries sustained by Linda M. Stockwell as passenger in his automobile.
There is a great mass of evidence in the record as to the opinions of various physicians and dentists concerning the injuries sustained by Linda M. Stockwell. There is no question that the child, who was five years of age at the time, was very seriously injured as a result of her father’s negligence. She was practically lifeless for a few days following the accident; her face was so severely swollen that it was feared that her eyes would be permanently affected; she sustained bilateral compound fractures of both jaws, lacerations of the face that still remain as scars, and multiple abrasions of the body.
*392 Her jaws and teeth were wired together in such fashion that eating, talking and normal facial activity were entirely lost. A tracheotomy was required so that she would not choke to death and a tube remained inserted in her neck for a period of twelve days and an ugly scar remains at the site where the tube had been inserted. She was on a liquid diet for more than a month and on a soft diet for a like period. It was necessary that she place soft foods in the corners of her mouth with her fingers so that she could suck the food into her throat. Severe and painful swelling of the jaws necessitated a return to the hospital for further treatment in the month of November.
Linda’s permanent injuries include facial and neck scars, facial, tongue and lip asymmetry, lack of occlusion, speech defect that will require coaching and practice, teeth injury that will require extensive orthodontic treatment at great cost, and a nervous condition for which she has been under the constant care of a pediatrician. The child will undergo plastic surgery without assurance that her face will ever be as it was prior to the accident, and there is every likelihood that she will lose her permanent teeth which will have to be replaced by dentures at an early age. She is under treatment by two doctors and a dentist, and will begin special training, all of which will incur enormous expense. There is medical testimony in the record showing that the facial and tongue deviation to the left is still without improvement and with possibly only a slight progression. The trial judge commented in his reasons for judgment on the existing impediment to the child’s speech.
While the judgment of $25,000 for injuries at first blush would seem excessive, when the medical testimony is carefully considered and analyzed there is no question at all in our minds that the child is entitled to the sum which the lower court awarded to her.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.